Next case this morning is number 17-1888, NHK Seating of America, Inc. v. Lear Corporation, Mr. Rubino. Good morning, Your Honor. May it please the Court, Mr. Rubino. Reading these briefs, I found it very difficult to understand what the contentions were. It seems to me that what happened before the Court is that you convinced them to combine two pieces of prior art, as shown on Appendix 15, and the material that's shown here in green on the left-hand side, as I understand it, was not part of the combination that rendered the claims obvious, other than claim two. Am I misunderstanding something? Your Honor, that's Lear's view of the decolorization. Our view was that we were combining teachings from references based on this Court's decades of precedent, not bodily incorporating pieces. But in general, the figure on the left of Appendix 15, the upper armature, which is the pink portion and the blue portion, that remained, and the red thing at the bottom, that was a belt, was replaced in the combination with the impact plate mechanism on the right. And in order to connect the impact plate mechanism on the right to the upper armature on the left, you would use a cable mechanism. Now, both references showed cable mechanisms. In our petition, we pointed to the cable in the reference on the right, DE-826. And then in our reply, we also said you could use the tabs from the cable on the left, and the P tab allowed us to supplement that and allowed Lear additional briefing, providing a certify on that point. Which specific elements represent the upper armature and the transfer member? The upper armature is the pink section, as well as the blue section. It's two, which is 2B and 2D. That's part of the upper armature. The lower armature is on the right figure from the other reference, the red and green, and that section is the lower armature. And then the transfer member is the cable mechanism, which connects the two, transfers the forces between the two. The cable mechanism is what? The green. The green? Yes, Your Honor. On the left. Well, you're not seeing it from here, but both references had a cable mechanism connecting their lower armatures to their upper armatures. The cable mechanism on the right was a basic cable, like a bicycle cable, called a bowding cable with an outer sheath and an inner cable that moves back and forth. The cable on the left had that same bowding cable, but it had this sort of spring mechanism, 6B, that cylinder at the top. And our expert said, you could use that cylinder if you want, but I wouldn't. He said, either way, the combined teachings of these references show you have to use a cable. That's a transfer member, some cable mechanism. And when you connect the pieces together, you can use a tab. It was obvious to use a tab at the end of the cable. That's all this claim is about, Claim 2, is whether you use a tab at the end of the cable to connect it to the upper armature. I'm sorry. For obviousness for Claim 1, that box 6B, that cylinder, is not part of the combination, right? It was not part of the initial combination. For Claim 2, now that Claim 2 adds the tab, now you insert box 6B into the combination. Our position and our expert explained, you could do it either way. It doesn't matter for this case. And then for purposes of Claim 2, you point to assorted different things about this box 6B that would, in your view, represent a tab. That's right, Your Honor. I thought your expert was saying he wouldn't use the green configuration that's on the left here. He said, I wouldn't do it, but you could do it. It doesn't matter. You could do it. It doesn't mean that that's obvious to do it. What I thought was happening with respect to Claims 1, 3, and 4 was that there was a cable mechanism, which was attaching the configuration on the right to the blue item labeled 2D on the left. Is that right? That's right, Your Honor. So why are we looking at all to the green configuration on the left-hand side, since your own expert said that's not something that he would do? That's a good point, Your Honor. We didn't care. Our position was it doesn't matter whether you use the green cylinder or not. Our expert said, personally, I wouldn't do it. But the issue is how do you connect a cable to the upper armature? And the reference on the left had a tab. And both experts agree that the most common way you connect a bicycle cable to something is with a tab at the end, both experts. They said that? Yes. They said the other side's expert said, yes, this is what you do. You connect a cable to something else with a tab. He said it was not unusual and it was very common. I think those were his words. Can you show us where he said that? Yes, Your Honor. Appendix 1287 and 8, which is Dr. Viano's testimony in his deposition. For example, in page 10 of the deposition, line 6, he says, the Bowden cables are usually fit with some connector at the two ends that is used to attach it to the components it's interfacing. And then another question, and can you give me an example of what that connector might be? And his answer was, well, take the hand brakes on the bicycle. It's flared, flared end that fits into the mating surface in the bicycle brake that the Bowden cable can pull to apply the brakes. And then again on page 12, he was talking about the flat extension tip at the top of page 12 of the deposition. And on line 6, he's asked, and was this type of structure typical in Bowden cables? And his answer was, not unusual. You argue that the lowermost structure, figure 2B, is a tab because it's operatively connecting the upper armature and the transfer member. That's right, Your Honor. Did you argue that claim 2's limitation should be read to operatively connect the upper armature and the transfer member? Yes. And where did you argue that in the record? Did we argue that? I don't recall that we raised that particular argument in the PTA. So you didn't, the answer was no rather than yes? And the answer was, I don't recall. But if we say that the green configuration on the left here is not part of the combination, then you have to argue, as I understand it, that the cable that's going to connect the right-hand configuration to the remaining part of the left-hand configuration has to have a tab on it, which would attach to the item 2D, right? That's right, Your Honor. So the question is, once we set aside the green configuration on the left-hand side, did you argue that it was obvious to attach a tab to the cable as an attachment mechanism to 2D? Absolutely, Your Honor. Where did you argue that the law? Dr. Kent explained it. I can show you Dr. Kent's testimony about that, unless you want to see where we rented it. Go ahead with Dr. Kent first. Okay. Dr. Kent in Appendix 13, 19, and 20. Okay. On 13, 19, he has about, in this section, both pages he goes on and on explaining why it was well-known to use tabs like this at the end of a cable. Of the cable casing, right? So that would send us back to the cylinder that's in green on the left-hand side of A15, right? Paragraph 42, the use of tabs was ubiquitous in the context of case assemblies. Again, when he's talking about cable casings, case assemblies, he's talking about this green on the left-hand side of DE 017. No, sir. No, Your Honor. He's not? No. Because if you look on… I mean, he's introducing this entire section, talking about the combined teachings of DE 017 and DE 826. Right. And he's saying that if you use a cable, whether you use the cylinder or not, and you can see on 13, 20, he has a picture of that cylinder, and he says three tabs there, three things that meet the definition of tab. And one is at the base of the cable, which holds the cable steady. That was our initial position. It's a tab. It extends from the cable, which is the transfer member, and it helps the operative connection. The other tab at the top is how you can connect it to the actual upper armature. And so if you don't use the cylinder, you need something to connect it to the upper armature, and that's what this reference taught, is how you can connect it. And both experts agreed that was a very common way to connect cables. As I understand the combination for Claim 1, you would just take the cable wire from the 826 and just run it through the loop in the blue lever 2D, right? You could do that, or you could use the tab, the DE 017. Well, for your Claim 1 combination. Yes, Your Honor. Right? When you were picking and choosing the elements from 826 and saying it would be obvious to replace what's in DE 107, at least the bottom part, you would be taking the wire from 826 and necessarily looping it through the opening in the lever 2D. That was the reasoning that you proposed in terms of making that combination and why it would work. I don't recall that we got to that level of detail in Claim 1. You didn't have to. There was no requirement of how you connected anything. So we didn't get to the level of how you would connect it, just that it was operatively connected. I think what the problem is, if you put aside the green thing on the left here, on 815, as being part of the combination, and you're going to make the combination with the cable, and the cable has to be attached to 2D using the tab, right? I'm sorry, Your Honor? The cable has to be connected to 2D. That's correct. Using a tab, right? That's right. Okay, so where is there testimony or argument by you before the Board that said, even putting aside the green configuration on the left figure here, it's still obvious to connect the 026 with 2D using a tab. Do you understand what I'm saying? I believe I do. And I would need to get my PTAB briefs. So in Appendix 694 through 698 is the section in our reply brief at the PTAB of how Claim 2 would be obvious, based on the teachings. And again, we're focused on the teachings, not trying to bodily incorporate one piece. If the tab in the drawing of DE-017 is shown connected to the cylinder and the cylinder is not in the combination, one of ordinary skill in the art is smart enough to know that you use the tab for the connection, whether you use the cylinder or not. Right, that's the question. Did you argue that? No, Your Honor, because the cylinder being out of the case came up only in the PTAB's decision on rehearing. We put those tabs, those additional tabs in the case and the PTAB allowed us. There was never a discussion of, well, is the cylinder in the case or not, by the PTAB. The first time we heard of that was from the decision on rehearing. Dr. Vajano, I think it's pronounced, Lear's expert, testified that even if we consider the uppermost structure a tab and not an eyeball, it couldn't connect table 6A with support structure 2 because, and now I'm quoting from it, it could not be attached with enough strength and robustness to be used at such a critical connection. Did you provide rebuttal testimony to that? Not rebuttal testimony, well, I don't know. Rebuttal evidence. Our evidence for that issue is what I cited earlier with Dr. Kent saying it's obvious to use a tab, everybody knows you use a tab, and Dr. Vajano. But that's not about the strength. Correct. Strength was, we did not because the board's claim construction had nothing to do with strength. The board's claim construction is a tab is something that extends from one or the other structure, the upper armature or the transfer member, and connects the two. And clearly that's what this tab does, at least the top tab does that. So we did not, Dr. Vajano's testimony that it's not strong enough to be a tab came out of nowhere and had no basis in this patent. There's no support for it, and it wasn't part of the PTAB's claim construction. Okay. We'll give you two minutes for rebuttal. Thank you, Your Honor. Frank Angellari. Thank you. May it please the Court. Frank Angellari for Lear. How can you say that PTAB's only rationale for finding motivation to combine was to provide features already present in each of the references individually? Sure. Where PTAB stated it found Dr. Kent's motivations persuasive? Your Honor, I don't recall. That's in their KSR discussion, 19. 19. I don't recall that PTAB citing Dr. Kent in its reason to combine analysis. I'm looking at page 19. So I'm not trying to avoid you, Your Honor, if there's something that I'm missing. I recall them citing Dr. Kent when they're summarizing the party's arguments, but with respect to the Board's analysis on reason to combine, I believe it is essentially combined to a paragraph on Appendix 19, and more particularly the last sentence of the, I'm sorry, pages 20 to 21, is the reason to combine analysis. A skilled artisan, and this is the sentence that bridges 20 to 21, but I believe this is the Board's analysis of the reason to combine. A skilled artisan would predict that the combination would successfully move the headrest in response to forces encountered during a collision, but not in response to forces encountered during normal operation. I believe that is the Board's statement of reason to combine. And the reason we say that's nothing new, or more particularly, the Board itself found that both references perform those same functions. Those findings are on Appendix 18. And on Appendix 18, the Board finds that both references move the headrest to support a position in response to a rear-end collision. And then later on in that paragraph, this is the only full paragraph on page 18, that both systems respond such that they hold the headrest in a non-actuated position during normal conditions. So on page Appendix 18, the Board finds that both references move during a collision and hold during a non-collision. And then on pages 20 to 21, the only stated reason to combine is that the combination would move during a collision and hold during a non-collision. So from our perspective, that has to be hindsight. If both references perform that function, there can't be a reason to combine them. What about the notion of, at A19, where the Board is saying, you're just substituting equivalents through known methods, and you'll yield a very likely predictable result of reaching the same result. So what they're doing is saying the functionality of everything going on in the two references, at least the lower half of them, are functionally equivalent, and they're substitutable one for another. Are you saying that that's a patentable advance, even if there's a finding that the substitution is readily available to achieve the same purpose? Well, the Board on page 19 does find that they're different. Well, just stay with me for a second. Okay, sure. If the Board concludes that these two configurations are substitutable one for the other, because they're designed to accomplish the same thing, and the contraption in the second reference can be easily adapted to replace the contraption in the first reference through known methods and will yield a likely predictable result, are you saying that it's wrong to find that to be obvious? Yes. Because? For two reasons. The first reason is there's no reason in the record to make the substitution. The second reason is... So you're saying if reference number one works just fine as is, even if there is an equivalent contraption in the second reference, you can be granted a patent for substituting in that equivalent contraption in the second reference because there isn't a problem with the first reference. Is that your understanding of obviousness? So I think my understanding is that it would depend, Your Honor, and it would depend on at least two things. One would be, is highly specific to this case, where the primary reference focuses almost entirely on one of the two, to use your example, one of the two sort of contraptions, and talks about why it's better than the contraption of the second reference, the secondary reference. In that case, I don't think you can say it's obvious to substitute the, in the context of this art, substitute the inferior lower structure for when the primary reference, and we make this point on page 12 of the red brief, the primary reference focuses entirely on that piston mechanism, which is referred to as the Bowden cable arrangement six. So in this context, you can't just substitute it because the primary reference is, in a sense, focusing entirely on the differences between its structure and the structure that's being proposed to substitute. It does? I believe it does, Your Honor. It says this is superior than the contraption in the 826? It doesn't, it certainly does not refer to the 826, but it focuses on the features of the primary reference. Where do we find that? Okay, it's on page 12 of the red brief, which is appendix 1101. And the difference is, Your Honor. Where are we on page 12? So page 12, this is really the only page. This also corresponds to appendix 1101, and it's essentially the only page of the DE 017 patent. It's really the entire specification. What we've illustrated is the highlighted language is the language that describes that piston arrangement, and it describes the fact that in that piston arrangement, a very quick motion will cause the piston to lock up and move in what he calls a quasi-stiff fashion, where a slow motion will cause no motion at all at the headrest. That's just describing how it works. Where does it say that the 026 configuration or something like it is inferior? It doesn't say it's inferior. What it says is this is better because it doesn't. Better than what? Better than the standard rigid connection, which is what the 026 has. Where does it say that? Where does it say it's better than a standard rigid connection? It talks about the fact that the headrest will move only in response to a quick motion. Let's see. For example, in paragraph 18, it says, I'm like five lines down. The pressure is generated by an abrupt or jerking motion, which is caused by the pressure organ being displaced with an appropriate speed. I don't see this denigrating alternatives. I'm not suggesting, Your Honor, that I don't think we have to denigrate alternatives. If I suggested that, I'm sorry. You said it was better. Fair enough. I think that's different. It has to be comparing it to something. I don't see it's comparing it to anything. It's comparing it. The entire point of this patent, this invention, is an actuation system that moves only on a fast pull of the cable. That's what the three paragraphs highlighted, the four paragraphs highlighted in yellow discuss. And the board actually made that finding. It is also undisputed that the secondary reference moves. This is on page 19. The board says, we agree that DE-017 and DE-826 use different mechanisms for avoiding movement of the headrest in response to normal. And then it says, DE-017 can move slowly without moving the headrest. Then it says, any displacement of the impact plate in 826 will move the headrest. So the findings on the differences between these structures is not disputed. We are not challenging the findings. What we are saying is that given that difference and given that the 826 entire focus is on the structure that enables that difference, you can't simply substitute a second structure unless there's a reason to do so. It's always going to be true that there are differences. Pardon me? It's always going to be true that there are differences. It is. Well, presumably otherwise you wouldn't have an obviousness. The difference, the significance of the difference in this case, Your Honor, is that the structure that's proposed to be removed is the entire focus of the DE-017. And the only reason offered, I'm sorry.  Sure. So if, in fact, looking at 850, we don't consider the green configuration on the left to be part of the combination that's bound to render the claims obvious, claims 1, 3, and 4, why wouldn't it be obvious also to use a tab to connect the cable to 2D? Two reasons. One, they never raised it. If you look, all of the tabs that they proposed are gone when the green material is gone. And that's the board. Why did we have testimony that use of a tab is quite common, routine way of doing, making a connection? There's also testimony that you wouldn't do it and that none of the structures they point to are tabs. So where is the testimony that you wouldn't use a tab? I don't think that's a fair burden to put on us. But you said there was testimony. I'm asking you where it is. I think the testimony that we have is that the structures that you have. If you have testimony that would not be obvious to use a tab to connect the right-hand configuration with 2D? I don't know, Your Honor, but I don't think we have any reason to provide that testimony when they had three different iterations of a tab and we successfully argued that none of the three are a tab and none of the three provide the connection function that's required by Claim 2. We don't have a burden to say that it's never obvious to use a tab. We have a burden to respond to what they've raised. And as the board detailed on Appendix 986, they went through at least three different permutations of what the tab is and what the structures that it has to be connected to are. The board rejected all three of those permutations. I don't know if we specifically said a tab sort of in the abstract isn't obvious, but I think it would be unfair to force that burden on us at any level. Certainly when they presented testimony that it was common and routine to use a tab, and one might expect you to refute that by saying, here's why it's not obvious in this context to use a tab. Well, the board certainly didn't make any findings in the abstract. The board looked at their three tabs they proposed. You also have the problem of the connection limitation. I mean, this is now we're manufacturing this limitation entirely out of the air. We're not pointing to anything in either of the references that discloses it. We're just saying it's obvious and trust me. I don't think that's not a finding the board made, and I don't think it's proper to even consider that at this juncture, Your Honor, because it wasn't an issue genuinely raised below. They pointed to three specific tabs, and we dealt with those three specific tabs. Would you agree with me that your obviousness arguments rise and fall with Claim 1? That is, that there aren't any elements of Claim 3 or 4 of 818 being separately argued? Yes, our obviousness arguments in our appeal are basically reason to combine arguments. We're saying the only reason offered by the board is a function that is part of both primary and secondary reference. The board's own findings. You don't contest that 017 and 826 disclose all elements of Claims 1 and 3 and 4, do you? No, but not in appeal, Your Honor. We challenge only the reason to combine for the two reasons. That's just housekeeping for me. Sure, and by the way, I apologize for Your Honor's comment about the briefs. For our part, to the extent we contributed to that, unless the court has any other questions. Okay, thank you, Mr. Angiolari. Mr. Rubino. Your Honor, counsel said that there was no reason in the record to make this substitution. That's not correct. And this is part of what their briefing, what was wrong with their briefing. Their briefing says that the PTAB did not rely on NHK's evidence or on Dr. Kent. That's absolutely incorrect. The PTAB said in a motion to exclude, in response to their motion to exclude Dr. Kent, that we will deny the motion and rule that the motion addresses issues more appropriate to determining the weight ascribed or evidence that we're not relying on. Or is the key thing. The PTAB gave two reasons to deny their motion to exclude. In their brief, they said and, they put those two reasons together in and, and then concluded that the PTAB did not rely on Dr. Kent. So that's an incorrect statement of what the PTAB ruled on. Now, if you look on Appendix 11 of the final written decision, the PTAB addresses Lear's arguments against combining the references. And, in fact, that's the title of the section of the decision, which starts on page 10. And the PTAB says, for the reasons expressed below, we are not persuaded by Lear's argument and evidence. And then those reasons expressed below carry on for 10 pages and includes a detailed analysis of NHK's factual evidence, the references themselves, Lear's evidence, as well as sites to Dr. Kent's testimony. And that 10 pages analyzes whether there was motivation to combine these references and suggestions to combine, whether it was proper to combine, and it also addresses Lear's principle of operation and intended purpose argument. So the PTAB did rely on Dr. Kent and NHK's evidence throughout that 10-page analysis and found factually that there was no destruction of the principle of operation or the intended purpose. The reasons to combine, some of the specific reasons to combine that Dr. Kent provided are cited on Appendix 16. For example, that the belt would lose elasticity over time, and if it was a bladder, which that belt is referred to as a bladder belt, that could lose air over time. So there were reasons why you would combine advantages of the DE-826 structure to combine it. The PTAB relied on that, and that was part of its reason for its conclusion. Okay, Mr. Romina, I think we're done. Thank you, Your Honor. Thank both counsel. We're talking about substituting the lower parts of these two structures, and not only is there no finding that they're equivalent, there's expressed findings on page 19 that they're not equivalent. Okay, thank you. The case is submitted.